# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 16, 2011 Session

## STATE OF TENNESSEE v. ROBERT JASON BURDICK

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1350      Seth Norman, Judge**

---

**No. M2009-02085-CCA-R3-CD - Filed April 18, 2012**

---

A Davidson County jury convicted the Defendant, Robert Jason Burdick, of one count of aggravated burglary and two counts of aggravated rape with bodily injury. The trial court sentenced him as a Range I standard offender to a cumulative sentence of thirty-two years in the Tennessee Department of Correction. On appeal, the Defendant argues that (1) the evidence is insufficient to support his convictions for aggravated rape with bodily injury, (2) the trial court erred by denying his pre-trial motions to suppress evidence, and (3) the trial court erred by imposing partial consecutive sentences. Upon review, we affirm the Defendant's convictions and the length of his sentences but remand the case to the Criminal Court of Davidson County for additional findings regarding consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; and Case Remanded**

DONALD P. HARRIS, SR. J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

John E. Herbison (at trial and on appeal), and Fletcher Long, and Carrie Gasaway (at trial), Springfield, Tennessee, for the appellant, Robert Jason Burdick.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Roger Moore, and Dana Shabayek, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Background

In May 2008, the Davidson County Grand Jury indicted the Defendant on thirteen counts. This appeal concerns counts eleven, twelve, and thirteen, which stem from the November 19, 2007, rape of B.S.[1]

At the trial, he victim testified that in November 2007, she lived alone at her home in Donelson, Tennessee. She was widowed and had grown children, who no longer lived at home. On November 18, 2007, she spent the evening watching television and fell asleep in the den near midnight. She was awoken by a man standing behind her telling her to get up. She recalled that she was not wearing her glasses when she woke up, and there were no lights on in the room. She could see the man, however, due to light from an adjoining room. She said that he was wearing a face mask, which she also described as a stocking cap with the eyes, nose, and mouth cut out, and a "hoodie-type jacket." She testified that she stood up, and the man put duct tape over her eyes. He told her to undress, and she complied. He then put duct tape around her wrists. The victim testified, "At that time he French kissed me and then he kissed my breast and then he told me to lay down on the floor." She followed his directions. The man told her that he would use a condom, and she heard a package opening. The man put his finger in her rectum and penetrated her vagina with his penis. The victim testified that her focus was on staying alive, so she allowed the contact. She said that she asked him to loosen her wrists, but he refused. She did not know whether he ejaculated or not, but he eventually told her to get up. He told her that he was taking her to the shower, which was at the opposite end of the house. When they reached the bedroom adjacent to the bathroom, the man cut the tape from her wrists. He put her in the shower and turned on the water. The man took the tape off of her eyes and told her to stay in the shower for ten minutes. He left the room but returned to turn on the light before leaving again. The victim testified that she did not stand under the water stream in the shower because she wanted to preserve whatever evidence he might have left. She got out of the shower after she thought that he had left. The victim testified that she swabbed her mouth with Q-tips and placed the Q-tips in a plastic bag. She noticed that an ornament, previously located in a bedroom window, had been moved. She dressed and left the house, intending to go to a hospital. On her way, she called her brother, and he convinced her to return to her home to wait for the police. She called the police, and they responded to her house. A police officer took her to a hospital, and the hospital staff performed a vaginal exam, took swabs of her breast and mouth, and took pictures. The victim gave the Q-tips from her house to the hospital staff. She recalled having "duct tape markings around [her] wrist" and a small cut on her wrist

---

[1] It is the policy of this court to refer to victims of sexual assault by their initials.

from when the man cut the tape off her wrists. The victim described the man as taller than her and of average weight. While she could not tell his race visually, she believed that he was Caucasian based on his voice.

On cross-examination, the victim testified that she had "[n]o physical injuries, other than the tape." She agreed that she meant that there was "a residue or a film" from the tape left on her wrists.

Metropolitan Nashville Police ("MNP") Officer Jacob Pilarski testified that he responded to an aggravated rape call on November 19, 2007. He met the victim and her brother at a Waffle House restaurant. The victim informed him that she had been raped at her home, and he went with her back to her house. Officer Pilarski testified that the victim had red marks on her face and wrists consistent with her report that the rapist used duct tape on her eyes and wrists. He found one unlocked window in her house. Officer Pilarski notified the sex crimes unit and transported the victim to the hospital for a sexual assault examination.

MNP Officer Dylan Kinney testified that he responded to the victim's home on November 19, 2007. He stayed at the house while Officer Pilarski took the victim to the hospital and remained on the scene while the identification section officers processed the house.

MNP Officer Thomas E. Simpkins testified that, as part of the police department's identification unit, he participated in processing the victim's home. In particular, he photographed shoe impressions on the house's air conditioning unit and lifted the impressions with black powder and tape. He also photographed a patio chair with mud on the legs and the holes in the yard underneath two windows that corresponded to the chair legs. He testified that it appeared that the perpetrator stood on the chair and the air conditioning unit to gain access to the victim's home through a window.

Nurse Merrill Stopplebein testified that she performed the victim's medical/legal examination on November 19, 2007. Nurse Stopplebein recalled that the victim was calm during her examination and that she had red marks on her wrists. The victim's pelvic examination was normal. As part of the medical/legal examination, Nurse Stopplebein collected pubic hair combings from the victim, as well as vaginal swabs, perianal swabs, labial swabs, and swabs of the victim's mouth and breasts. She also took a sample of the victim's blood for comparative DNA purposes. She packed the items into a box, which was sealed and locked into a cabinet until Detective Wiser took custody of it.

On cross-examination, Nurse Stopplebein testified that she believed that she prematurely marked the box on her report indicating that she did not observe any injuries on the victim's extremities. On the chart accompanying the report, she indicated that the victim had injuries on her wrists. Nurse Stopplebein testified that the injuries were red marks from the tape that the perpetrator used to bind the victim's wrists. At the time of the examination, she did not observe a cut or bruise on the victim's wrists.

MNP Detective Jeff Wiser testified that on November 19, 2007, Officer Pilarski apprised him of the victim's complaint and the information the officers had gathered, and he met the victim at the hospital. He interviewed her prior to her medical/legal examination. The following day, he took the evidence box collected by Nurse Stopplebein to the Tennessee Bureau of Investigation Crime Lab. He received the results approximately one month later.

Detective Wiser testified that he inspected the victim's house, along with other officers. He recalled finding two condom wrappers in a ditch near the house and rolled duct tape in another yard nearby. At the time, he did not know how long the items had been outside or whether they were connected to the victim's case. Another detective discovered a Precious Moments figurine outside of a window of the victim's home.

Detective Wiser testified that in April 2008, the Defendant's name surfaced as a suspect. Detective Wiser collected buccal swabs from the Defendant, which he gave to Detective Kent McAlister, and participated in a search of the Defendant's home and vehicle. The police recovered a roll of duct tape, thirteen condoms inside a handgun case, a black ski mask, a blue ski mask, and a blue toboggan from the Defendant's home. They also recovered a roll of duct tape from the Defendant's vehicle. The detective recalled that the Defendant had several handguns and "quite a few black clothes." He testified that the police found night vision goggles and anti-dog-barking devices in the Defendant's bedroom. On cross-examination, Detective Wiser admitted that the condom wrappers found outside of the victim's home were not the same type as the condoms found in the Defendant's home.

MNP Detective Kent McAlister testified that he transported the Defendant's buccal swabs from the police department's property room to the TBI crime lab. TBI Special Agent Constance Howard, a forensic scientist, testified that she extracted DNA from the Defendant's buccal swabs to obtain his genetic profile, which she gave to Agent Chad Johnson.

TBI Special Agent Chad Johnson, a forensic scientist, testified that he analyzed the victim's sexual assault kit. He stated that he found only the victim's DNA on her gum swabs, vaginal swabs, and labial swabs. He found a mixture of the victim's DNA and male

DNA on the anal swabs and tongue swabs and the same male's DNA on the breast swabs. Agent Johnson testified that the male DNA matched the Defendant's genetic profile.

After the close of proof and deliberations, the jury found the Defendant guilty as charged of aggravated burglary and two counts of aggravated rape. The trial court sentenced him to three years for the aggravated burglary conviction and to sixteen years for each aggravated rape conviction. The trial court ordered the Defendant to serve the aggravated rape sentences consecutively, and the court imposed the aggravated burglary sentence concurrently with the first aggravated rape sentence, resulting in a cumulative sentence of thirty-two years.

**Analysis**

On appeal, the Defendant argues that the evidence was insufficient to support his convictions for aggravated rape; that the trial court erred by denying his motion to suppress evidence; and that the trial court erred by imposing partial consecutive sentences.

I. Sufficiency of the Evidence

The Defendant contends that the evidence presented at trial failed to prove that the Defendant caused bodily injury to the victim during the rape, thus failing to meet the required elements of a conviction for aggravated rape. He relies on *State v. Tutton*, 875 S.W.2d 295, 297 (Tenn. Crim. App. 1993), for the proposition that bodily injury must occur during the rape rather than after the rape is accomplished in order for the offense to rise to the level of aggravated rape. The State responds that the victim's injuries were caused by the Defendant's use of duct tape to bind her during the rape.

For purposes of appellate review, a jury's finding of guilty removes a defendant's presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, a convicted defendant bears the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court reviews the evidence to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence. *Carruthers*, 35 S.W.3d at 558. The jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). We do not attempt to re-weigh or re-evaluate the evidence because questions concerning the credibility of the witnesses, conflicts in trial testimony, the

weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002)*; State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id.*

As relevant to this case, aggravated rape is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" accompanied by the defendant's causing bodily injury to the victim. Tenn. Code. Ann. § 39-13-502(a). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(2).

The Defendant concedes that the evidence was sufficient to sustain a conviction for rape but contends that any bodily injury occurred after the rape. He argues that, under *Tutton,* the bodily injury must accompany the rape in order to elevate the offense to aggravated rape, and any injury that occurs after the rape is insufficient to meet the requirements for aggravated rape. In *Tutton*, the defendant raped the victim in a car, went for a walk with her in a park, and then hit and stabbed her when they returned to the car. 875 S.W.2d at 296. On appeal, the defendant assigned error to the trial court's refusal to charge the jury with the lesser included offense of rape. *Id.* at 297. The appellate court ruled that the trial court should have charged the lesser included offense of rape because the proof did not show a temporal relationship between the rape and the stabbing. *Id.* The court further ruled that the remedy was to modify the defendant's conviction to rape. *Id.* 297-98.

Viewed in the light most favorable to the State, the evidence shows that the Defendant's unlawful sexual penetration of the victim was accompanied by bodily injury. The Defendant entered the victim's home without her permission, ordered her to remove her clothes, bound her wrists and covered her eyes with duct tape, and raped her. The victim testified that she asked the Defendant to loosen her wrist bindings, but he refused. The victim also testified that she had marks around her wrists from the duct tape and a small cut from the perpetrator's removal of the duct tape. Officer Pilarsky observed red marks on the victim's face and wrists that were consistent with her report of the perpetrator using duct tape on her eyes and wrists. Nurse Stopplebein also observed red marks on the victim's wrists from the tape used to bind the victim's wrists. The evidence demonstrates that the Defendant used duct tape to bind the victim's wrists and cover her eyes in order to accomplish the sexual assault. The use of the tape during the sexual assault established a temporal relationship between the use of the tape and the crimes. The present case is distinguishable from Tutton, in which the bodily injury was inflicted well after the sexual assault was accomplished. See 875 S.W.2d at 297. We conclude that the evidence was sufficient to

sustain the Defendant's convictions for aggravated rape.

## II. Motions to Suppress

The Defendant challenges the trial court's denial of his pretrial motions to suppress evidence seized by the police from his person, home, and vehicle. The State contends that the Defendant waived appellate consideration of the trial court's ruling because the record does not contain the search warrant nor does it reflect that a warrant was issued pursuant to the affidavit attached to the Defendant's first motion to suppress evidence. The State has not addressed the merits of the issue. We hold that the Defendant has not shown that the trial court erred in denying the motions.

We consider, first, the State's contention that the Defendant has waived appellate consideration of the issue. The State is correct that the Defendant was required to prepare a record that conveyed a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal. T.R.A.P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Likewise, the State is correct that there is no search warrant in the record. The record reflects, though, that a nine page document titled "Affidavit in Support of Application for Search Warrant" was attached to Defendant's first Motion to Suppress. The motion referred to the affidavit and stated that it was attached. The attached affidavit contained detailed factual allegations and was signed by Detective Elliott. It was sworn to before a general sessions judge and contained the judge's signature.

The record reflects that the affidavit was offered as an exhibit by the Defendant at one of the suppression hearings and that it was marked as exhibit 1, although that exhibit is not part of the record that has been provided to this court. Defense counsel represented to the court at that suppression hearing that "searches were carried out of [the Defendant's] residence, of his business, of his automobiles and of his person to obtain a DNA sample." Defense counsel also represented to the court that the affidavit that was attached to the motion to suppress was the affidavit the police relied on to support the searches. The State did not contest defense counsel's representations at the hearing, and it argued that the affidavit stated a sufficient basis from a which a judge found probable cause.

At the trial, Detective Wiser testified that pursuant to a search warrant, he obtained buccal swabs from the Defendant and participated in searches of the Defendant's home and Jeep. He identified items seized during those searches, which were received as exhibits. We conclude that the Defendant has not waived our consideration of the trial court's ruling. See State v. Bobbadilla, 181 S.W.3d 641, 642 (Tenn. 2005) (considering the merits of a defendant's appeal of the trial court's denial of a motion to suppress where the search

warrant was appended to the motion to suppress, but not received as an exhibit at the hearing, and was part of the appellate record).

With respect to the merits of the Defendant's issue, this court conducts a de novo review of a trial court's conclusions of law and application of law to facts when reviewing the trial court's decision on a motion to suppress. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). However, we presume that the trial court's findings of fact are correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).

*A. Defendant's Motion to Suppress Evidence Obtained as a Result of the Search Warrant*

The Defendant's first motion to suppress contended that the affidavit in support of the search warrant did not contain evidence providing a basis for probable cause. In Tennessee, it is well-established that an affidavit is necessary to the issuance of a search warrant. Tenn. Code Ann. § 40-6-103; *State ex rel. Blackburn v. Fox*, 292 S.W.2d 21, 23 (1956); *Harvey v. State*, 60 S.W.2d 420 (1933). The affidavit must set forth on its face the facts which establish probable cause before a warrant may be issued. Tenn. Code Ann. § 40-6-104; Tenn. R. Crim. P. 41(c). The issuing magistrate must make a neutral and detached judgment that probable cause is shown. *See State v. Nolan*, 617 S.W.2d 174, 175 (Tenn. Crim. App. 1981). The following requirements must be met to show adequate probable cause:

> Probable cause requires reasonable grounds for suspicion, supported by circumstances indicative of an illegal act. *State v. Stevens*, 989 S.W.2d 290, 293 (Tenn. 1999). To ensure that the magistrate exercises independent judgment, the affidavit must include more than conclusory allegations from the affiant. [*State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005)]. The affidavit must present facts upon which a neutral and detached magistrate, examining the affidavit in a commonsense and practical manner, can determine whether probable cause exists for the issuance of a search warrant. *Id.* In examining the affidavit, our standard of review is limited to a determination of whether the issuing magistrate had "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *State v. Ballard*, 836 S.W.2d 560, 562 (Tenn. 1992).

*State v. Smotherman*, 201 S.W.3d 657, 662 (Tenn. 2006).

As noted above, the conclusory allegations of an affiant are not sufficient to sustain a warrant. *Carter*, 160 S.W.3d at 533. "'Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.'" *State v. Moon*, 841 S.W.2d 336, 337-38 (Tenn. Crim. App. 1992) (quoting *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965)). "Thus, in Tennessee, probable cause to support the issuance of the warrant must appear in the affidavit and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Moon*, 841 S.W.2d at 338. "Tennessee law is clear that in determining whether or not probable cause supported issuance of a search warrant only the information contained within the four corners of the affidavit may be considered." *State v. Keith*, 978 S.W.2d 861, 870 (Tenn. 1998) (citing *Jacumin*, 778 S.W.2d at 432). "If probable cause is absent, the magistrate is not empowered to issue a warrant." *State v. Kamara L. Whittington*, No. W2007-00148-CCA-R3-CD, 2008 WL 1891450, at *2 (Tenn. Crim. App., at Jackson, Apr. 20, 2008). "The reviewing court's standard should be whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." *State v. Meeks*, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993).

The affidavit states the following: Eleven "rapes and/or personal attacks" occurred between March 1994 and December 2006, in homes in the Forest Hills area, by an individual known as the "Wooded Rapist," due to similarities in the crimes. The attacker was a white male of average build in his 20s or 30s, wore dark clothes and gloves, and covered his face. The perpetrator had a gun, knife, or "other cutting instrument." The victims were bound and blindfolded, and some were taken to another part of the property. DNA evidence was recovered from eight of the attacks. DNA analysis showed that all of these attacks were perpetrated by the same person. The perpetrator made statements to the victims that indicated he had been watching the victims or their homes. In 2005, the victim of a burglary and attempted rape assisted the Tennessee Bureau of Investigation (TBI) develop a sketch of the perpetrator. The sketch was similar to the Defendant's driver's license photograph. Around 1:00 or 1:30 a.m. on November 4, 2004, a neighbor saw one of the victims outside with another person during one of the rapes. The perpetrator of the rape took the victim outside during the assault. The following day, a witness reported having seen a man at about 7:00 p.m. the previous day. The witness described a white male, dressed in black, wearing a black stocking cap, and standing behind a tree near a business that was behind the victim's home. About two blocks away, on April 28, 2008, a witness who was visiting a family member on the same block as the street where the November 4, 2004 rape took place was sleeping in a camper when she was awakened by a growling dog. She looked outside and saw a man in dark clothing and a ski mask standing between two cars on the property and

looking inside the cars with a flashlight. She yelled at the person, who said something unintelligible and walked toward Williamsburg Road. The witness notified the police. A police officer found a Jeep, which was registered to the Defendant, parked on a street within walking distance. The Jeep's hood was warm. He saw a red hat, a black bag, and beverage containers in the Jeep. The officer remained in the area and, around 1:31 a.m., he saw the Jeep leaving the area. He stopped the Jeep, which was driven by the Defendant. The Defendant was wearing camouflage pants, a gray t-shirt with cut-off sleeves, tennis shoes, and the red hat the officer had seen earlier in the Jeep. The Defendant was approximately 5'11", weighed about 200 pounds, and had a muscular build, brown hair, and blue eyes. The Defendant told the officer that he had been visiting a friend named Ricky Douglas at a house located near the place the officer saw the Jeep earlier. The Defendant said he parked on the street because there were several other cars in the driveway. The Defendant refused to consent to a search of the Jeep. Officers went to the home the Defendant identified as his friend's and spoke with one of its residents. She denied knowing the Defendant or that there had been a gathering at the house earlier, although she identified six other people who were staying overnight at the house. Police officers conducted hundreds of hours of nighttime surveillance of the area in 2006 and 2007 and never saw anyone on foot in the neighborhood. The Defendant's physical appearance matched that given by the victims and a sketch prepared by the TBI. The affiant believed there was probable cause to believe the Defendant was the person on foot in November 2004 and the perpetrator of the attacks. The affidavit identified the Defendant's home by address, appearance, and photograph and requested permission to search the home and its occupants, as well as outbuildings and cars on the premises.

As we have noted, there were no witnesses at the hearing. Defense counsel offered the affidavit as an exhibit, although the exhibit has not been transmitted to this court as such. The trial court filed a written order denying the motion. In considering the sufficiency of the affidavit, the court considered the facts alleged in the affidavit as well as those stated in a transcript of the April 28, 2008 9-1-1 call. To the extent that the trial court considered the 9-1-1 transcript, it erred. The court was limited to the facts set forth on the face of the affidavit. *See* Tenn. Code Ann. § 40-6-104; Tenn. R. Crim. P. 41(c); *Keith*, 978 S.W.2d at 870; *Jacumin*, 778 S.W.2d at 432.

The question becomes whether the trial court properly denied the motion despite its erroneous reliance on matters outside the four corners of the affidavit. The written order denying the first motion to suppress contains detailed findings of fact. The court noted the proximity of the attacks and the similar descriptions of the perpetrator. It found that the "[m]ost important" fact was that on April 28, 2008, the Defendant's still-warm car was parked a short distance from the address where a few minutes earlier, a witness saw a suspicious person. The court also noted that the Defendant's report of his whereabouts that

night was contradicted by the resident whose home the Defendant said he had been visiting. The court found that the Defendant's clothing appeared to be dry, as if he had just changed, although "it was evidently raining on April 28, 2001 [sic]." The court noted the similarities of the clothing worn by the suspicious person seen that night, the "Wooded Rapist," and the perpetrator of the November 2004 rape on the same block. The court found that despite the gap of almost four years between the November 2004 rape and the April 2008 suspicious person sighting, the attacks had occurred sporadically over a fourteen-year period. The court discredited as unreliable the evidence of the Defendant's height of 5'11" as estimated by the police officer who conducted the traffic stop and the 9-1-1 caller's estimate that the person looking in the cars with a flashlight was about 5'7". Considering these facts, the trial court found that the magistrate had probable cause to issue the search warrant. Upon review, we conclude that the affidavit provided sufficient facts to support a finding of probable cause, the trial court's erroneous reliance upon the 9-1-1 transcript notwithstanding. In so holding, we note that aside from the information from the 9-1-1 transcript about the suspicious man's height, which the court discredited as unreliable, the facts the trial court recited in its order that appear in the 9-1-1 transcript also appear in the affidavit.

*B. Defendant's Motion to Suppress the Evidence Obtained as a Result of the Traffic Stop and the Search Warrant*

After the trial court denied the first motion to suppress, the Defendant filed a second motion focusing on the legality of the April 28, 2008 traffic stop. Attacking the evidence obtained pursuant to the search warrant a second time, the Defendant contended that the evidence was tainted as "fruit of the poisonous tree" because the investigation of the Defendant and subsequent search warrant were based upon information obtained during the illegal traffic stop. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, and "'article 1, section 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (1968)). The analysis of any warrantless search must begin with the proposition that such searches are per se unreasonable under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution. This principle against warrantless searches is subject only to a few specifically established and well-delineated exceptions. *See Katz v. United States,* 389 U.S. 347, 357 (1967); *State v. Tyler*, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980). Evidence discovered as a result of a warrantless search or seizure is subject to suppression unless the State establishes that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

An exception to the warrant requirement exists when a police officer conducts an investigatory stop based on a reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Binette*, 33 S.W.3d at 218. Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity[.]" *Binette*, 33 S.W.3d at 218 (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Reasonable suspicion is determined based upon the totality of the circumstances of the encounter. *Binette*, 33 S.W.3d at 218 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). The police may stop a vehicle if they have either probable cause or an "articulable and reasonable suspicion" that the vehicle or its occupants are subject to seizure for violation of the law. *See Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *State v. Watkins,* 827 S.W.2d 293, 294 (Tenn. 1992). An officer's subjective intention for stopping a vehicle is irrelevant, as long as independent grounds exist for the detention. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *State v. Vineyard*, 958 S.W.2d 730, 731 (Tenn. 1997).

At the hearing on the second motion, Brentwood Police Officer Elliot Hamm testified that he was on patrol duty on the evening of April 27, 2008, through the morning of April 28, 2008. He recalled that it was raining intermittently that night. Officer Hamm testified that on rainy nights his patrol duties focused on the investigation of the so-called Wooded Rapist. On April 28 at approximately 12:30 a.m., the police received a suspicious person call in the Meadowlake subdivision. The caller reported that a masked man was looking into vehicles. Officer Hamm and five other officers responded to the area to look for a man on foot. Officer Hamm testified that he observed a Jeep Grand Cherokee, with Tennessee license plate number 771-QZJ, parked on the side of the road at an intersection. He stated that the suspicious person was last seen walking toward that area and that the Jeep was the only vehicle parked on the side of the road in the area. The Jeep was unoccupied, and the engine was warm. Officer Hamm ran the tag and learned that the Jeep was registered to the Defendant. He also obtained the Defendant's driver's license photograph. He continued searching the area on foot and assisted other officers in stopping cars leaving the area. He returned to the Jeep approximately one hour later and noticed that it was moving eastbound on Meadowlake Drive. He initiated a traffic stop with his emergency equipment in order to determine the driver's identity. The driver stopped, and the officer approached the Jeep. The driver, the Defendant, was alone and wore a red cap and a sleeveless gray shirt. Officer Hamm said that he explained to the Defendant that the police were searching for a prowler in connection with the suspicious person call. The Defendant told him that he had been at a party at 5201 Meadowlake Drive visiting Ricky Douglas. Officer Hamm said the Defendant became nervous during the stop. He checked the Defendant's driver's license and obtained the Defendant's phone number in order to complete a field interview card. Officer Hamm asked the Defendant for permission to search his vehicle, and the Defendant refused.

Officer Hamm spent three to five minutes with the Defendant and allowed the Defendant to leave.

On cross-examination, Officer Hamm testified that the person who called about the suspicious person said the person was dressed in all black and wore a ski mask. He said he saw the parked Jeep within five minutes of being dispatched to the area. He said he saw the Jeep in motion three-tenths of a mile from the location it had been parked. He stated that his patrol car camera captured the stop of the Defendant but that the video was of poor quality. He said that when he stopped the Jeep, he thought he was investigating a car burglar, not that he had apprehended the Wooded Rapist. He said he investigated the Defendant's claim to have been at a party and learned that the Defendant had lied about being at the home. He stated that there were four or five cars parked in the home's driveway when he went to investigate the Defendant's claim but that there was still room in the driveway to park another car.

The trial court denied the Defendant's motions to suppress in a written order. In considering the totality of the circumstances, the court noted that there were very few cars in the area and virtually no foot traffic, that the Defendant's Jeep was the only car parked on the street in the neighborhood where the witness saw the suspect looking into cars, that the hood of the Jeep was warm when it was parked on the street, that the traffic stop was in the area where the Wooded Rapist attacked took place, that the Wooded Rapist watched his potential victims in that area, and that the Wooded Rapist wore clothing similar to that the witness described the suspect as wearing.

Upon de novo review, we hold that the Defendant has not shown error in the trial court's ruling. The evidence of record demonstrates that after a 9-1-1 call reporting a masked person peering into cars was received, six officers searched the area on foot. When Officer Hamm stopped the Defendant, he knew about the Wooded Rapist attacks in the area and that a suspicious person wearing clothes similar to the Wooded Rapist's had been seen in the area that night. He knew that the Defendant's unoccupied Jeep was parked on the side of the road around the time the suspicious person was reported, that it was the only car parked on the street in the area, and that it had been driven shortly before the 9-1-1 call was received. These specific and articulable facts support the trial court's finding that Officer Hamm had reasonable suspicion to conduct a brief investigative stop of the Defendant. The Defendant is not entitled to relief on this basis.

III. Sentencing

Finally, the Defendant argues that the trial court erred by imposing consecutive sentences on the basis of a finding that the Defendant was a dangerous offender without the analysis necessary to support such a finding.

An appellate court's review of a challenged sentence is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of following statutory criteria apply:

(1) [t]he defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

In the present case, the trial court simply found the Defendant was a dangerous offender. "That finding required the trial court to analyze whether the Defendant's criminal behavior indicated 'little or no regard for human life' and whether he had 'no hesitation about committing a crime in which the risk to human life is high.'" *State v. Allen*, 259 S.W.3d 671, 689 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-115(b)(4)). In addition, specific findings that an extended sentence is necessary to protect society and is reasonably related to the severity of the offenses are prerequisites to consecutive sentencing under the "dangerous offender" category in Tennessee Code Annotated section 40-35-115(b)(4). *Id., State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). The general principles of sentencing require that the length of sentence "be justly deserved in relation to the seriousness of the offense" and "be no greater than that deserved for the offense committed." Tenn. Code Ann. §§ 40-35-102(1), -103(2); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court's justification for imposing consecutive sentences was a conclusory finding that the Defendant was a dangerous offender. The trial court indicated that it accepted the State's argument but did not explicitly make the analysis and findings necessary under *Allen* and *Wilkerson* to categorize the Defendant as a dangerous offender. Therefore, we remand this matter to the trial court solely to make the appropriate analysis and findings to determine whether the imposition of consecutive sentencing is appropriate.

## Conclusion

Based on the foregoing, we affirm the Defendant's convictions but remand the case to the trial court for sentencing proceedings in accordance with this opinion.

_____
DONALD P. HARRIS, SENIOR JUDGE